IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DULCICH INC., an Oregon corporation,

        Plaintiff,

        v.

COORDINATED CARE PROGRAMS, LLC,
a foreign corporation,

        Defendant.

Case No. 3:15-cv-01522-SB

**FINDINGS AND RECOMMENDATION**

**BECKERMAN, Magistrate Judge.**

        In November 2009, plaintiff Dulcich Inc. ("Dulcich") and defendant Coordinated Care Programs LLC ("CCP") entered into an agreement for defendant to manage plaintiff's employee health benefit plans. The parties renewed and amended this agreement annually until late November 2014, when Dulcich elected not to renew the agreement for 2015. The parties dispute whether Dulcich now owes CCP a termination fee under the agreement. Dulcich filed this action, seeking a declaratory judgment that it does not have to pay the termination fee,[1] and CCP has brought a counterclaim for breach of contract based on Dulcich's failure to pay this fee.

---

[1] Dulcich filed this Complaint in the Clackamas County Circuit Court for the State of Oregon, and CCP timely removed the action to this Court. Dulcich moved to remand the case

PAGE 1 – FINDINGS AND RECOMMENDATION

Before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the district judge should grant Dulcich's motion for summary judgment and deny CCP's motion for summary judgment.

## BACKGROUND

### I. THE PARTIES AND THE ORIGINAL CONTRACT

Dulcich is an Oregon-based company doing business as Pacific Seafood. (Palmer First Decl. ¶ 2.) CCP is a health care service provider that contracts with employers such as Dulcich that have self-funded health care plans to manage and control the costs of these plans. (Trott Second Decl. ¶ 5.)

In 2009, Dulcich engaged CCP to help reduce Dulcich's costs. The parties' relationship was formalized by a November 1, 2009 agreement drafted by CCP—the Coordinated Health/Care Services Agreement (Palmer First Decl. Ex. A ("Original Contract").) Pursuant to the Original Contract, CCP provided services to Dulcich's employees by administering and managing Dulcich's employee health care benefit plans from November 2009 to October 31, 2010. (*Id.*) The parties then negotiated annual renewals, which served as addenda to the Original Contract for each respective plan year until Dulcich elected not to renew in late 2014. (Palmer First Decl. ¶¶ 6-9, 12, 17, and Exs. B–F.)

The Original Contract specified a performance-based compensation plan in which CCP earned a fee only if Dulcich spent less money on its employee benefit plan ("Performance Fee"). The parties agreed to establish metrics for how Dulcich's health care plan would perform while in CCP's hands. (Original Contract.) These metrics are known as "Claims Targets." (*Id.* § 5.) A Claims Target reflects what employee health care claims would cost in a particular year in the

---

pursuant to 28 U.S.C. § 1447, and CCP moved to transfer venue pursuant to 28 U.S.C. § 1404(a). Both motions were denied. (ECF No. 20.)

absence of CCP's services. (Trott Second Decl. ¶ 5.) The Original Contract described three categories of targets: (a) basic medical services, (b) complex medical services, and (c) pharmacy costs.

Claims Targets were measured in terms of the money that Dulcich should have to spend on each plan member for each month that he or she was in the health care plan. (Original Contract § 5.3.) The Original Contract referred to this unit of measurement as "per member per month," or "PMPM." Under the Original Contract, the parties agreed to Claims Targets of $275.23 PMPM for basic medical, $107.09 PMPM for complex medical services, and $60.71 PMPM in pharmacy costs. (*Id.* § 3.) These Claims Targets were then used to calculate CCP's Performance Fee. (*Id.* § 4.) If Dulcich spent less money over the course of the year than the amount of a given Claims Target, CCP earned a Performance Fee equal to 50 percent of the difference between the actual amount spent and the Claims Target. (*Id.*) Dulcich would pay advances toward this Performance Fee monthly and quarterly, with annual reconciliation based on the final calculation of the year's Performance Fee. (*Id.*) At the end of each year, the parties would agree to new Claims Targets and the process would repeat. (Palmer First Decl. ¶¶ 6-9, 12; Exs. B–E.)

Of particular note to the current dispute, the Original Contract also contained a Termination Fee. According to CCP, its services create long-term benefits for its clients. (Trott Second Decl. ¶ 7.) For example, CCP's services include the identification and management of employees who are expected to generate significantly more costs in the future. (*Id.*) Identifying these individuals creates long-term savings for employers. (*Id.*) CCP therefore charges a Termination Fee to protect itself from the risk that a client will engage the company for a short period of time, benefit from the identification of these individuals and the associated long-term

PAGE 3 – FINDINGS AND RECOMMENDATION

savings, and then terminate the contractual relationship. (*Id.*) CCP asserts that the Termination Fee therefore compensates it for the lost opportunity and the additional value that accrues to the client beyond the termination date. (*Id.*)

Section 6.6(a)(2) of the Original Agreement states that in the event Dulcich elected not to renew the contract in a particular year, Dulcich agreed to pay CCP a Termination Fee equal to "50% of the annualized maximum for the ending Plan Year." Importantly, the Termination Fee is triggered only if "the Total Claims for the ending Plan Year are below the Total Claim Target for such ending Plan Year." (Original Contract § 6.6(a)(2).)

## II. ANNUAL RENEWAL AGREEMENTS

Each year after the parties signed the Original Contract in November 2009, CCP sent Dulcich a document titled "Fee Proposal" for the coming plan year. (Palmer First Decl. ¶ 5.) These Fee Proposals were drafted by CCP, and gave Dulcich the ability to change the compensation structure for the coming year in four different ways. (*Id.*) Option 1 offered to keep CCP's compensation structure exactly as it was under the Original Contract. (*Id.* Exs. B–F.) Option 2 amended the Original Contract by adding maximum and minimum values to CCP's annual Performance Fee, giving Dulcich assurance that it would not have to pay more than a certain amount and CCP assurance that it would receive at least a certain amount. (*Id.*) Option 3 retained these maximums and minimums, but also removed the three distinct categories of Claims Targets (basic medical, complex medical, and pharmacy costs) and replaced them with a single combined Claims Target. (*Id.*) Finally, Option 4, known as the "Fixed-Fee Option," did away with the Performance Fee structure altogether, replacing it with a fixed sum that Dulcich would have to pay no matter how many or how few claims there were in the coming year. (*Id.*)

The Fee Proposals amended the Original Contract, and the parties agreed that each Fee Proposal "to the extent inconsistent, supercede[d] the terms and schedules in the [Original

PAGE 4 – FINDINGS AND RECOMMENDATION

Contract]." (*Id.*) The total agreement in this case is therefore the Original Contract plus each respective Fee Proposal ("Amended Contract").

On October 5, 2010, Dulcich agreed to renew the agreement under a new set of Claims Targets for the coming 2010-2011 Plan Year. (*Id.* ¶ 7; Ex. B.) Dulcich chose Option 2, which preserved the three categories of Claims Targets, and included global maximum and minimum payments. (*Id.* ¶ 7; Ex. B.)

On September 29, 2011, Dulcich chose to renew using Option 3, which disregarded the categories of Claims Targets and instituted one combined Claims Target bracketed by annual minimum and maximum payments. (*Id.* ¶ 8; Ex. C.)

On September 21, 2012, Dulcich renewed again and selected the Fixed Fee Option, Option 4. (*Id.* ¶ 9-10; Ex. D.) Plaintiff agreed to pay CCP the greater of $15,639 per month "or $13.17PMPM" for a minimum fixed fee of $187,664. (*Id.* Ex. D.)

On September 12, 2013, Dulcich again renewed with the Fixed Fee option. This time, the Fixed Fee increased to $17,184 per month for "a minimum fixed fee of $206,206 annually." (*Id.* Ex. E ("2013 Fee Proposal").) This was the last Fee Proposal that Dulcich signed and, therefore, the most recent amendment to the Original Contract.

In late 2014, Dulcich notified CCP that it would not renew the Amended Contract for the plan year beginning November 1, 2014. (Trott Second Decl. ¶ 13.) On November 26, 2014, CCP sent an invoice to Dulcich invoking Section 6.6(a)(2) of the Original Contract and seeking payment of the Termination Fee, which it calculated as $103,103, or 50 percent of the annualized maximum specified in the 2013 Fee Proposal. (*Id.* ¶18; Ex. B.) In its invoice, CCP also stated that it would accept a reduced termination fee of $68,048 if Dulcich would pay the invoice. (*Id.* ¶18; Ex. B.) Dulcich refused this offer to pay the reduced termination fee, and filed this action

PAGE 5 – FINDINGS AND RECOMMENDATION

seeking declaratory judgment. (*Id.* ¶18.) CCP removed to federal court and filed a counterclaim for breach of contract based on Dulcich's failure to pay the Termination Fee.

The Original Contract states—and the parties agree—that this dispute is to be governed by Ohio law.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id.* at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Interpretation of the terms of a contract is a matter of law. *Inland Refuse Transfer Co. v. Browning-Ferris Indus., Inc.*, 474 N.E.2d 271, 272 (Ohio 1984) (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978)).

### II. DISCUSSION

Section 6.6(2)(a) of the Original Contract establishes the non-renewal termination fee at issue here, and states that this fee is owed only "if the Total Claims for the ending Plan Year are below the Total Claim Target for such ending Plan Year." The principal dispute between the parties is whether they agreed to a set of Claims Targets for the final year of their contractual relationship. This issue is critical, since if there is no Total Claims Target for the ending Plan Year, the condition that actual claims be less than the Total Claims Target cannot be met, and Dulcich does not owe the termination fee.

PAGE 6 – FINDINGS AND RECOMMENDATION

Under Ohio contract law, a court should "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Sunoco, Inc. v. Toledo Edison Col.*, 953 N.E.2d 285, 292 (Ohio 2011). The court will "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent." *Id.* If the language of a written contract is "clear, a court may look no further than the writing itself to find the intent of the parties." *Id.* A contract is "unambiguous if it can be given a definite legal meaning," *id.* (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)), and courts may employ rules for construing ambiguous language only when a definitive meaning proves elusive, despite a thorough and objective examination of the statutory language, lest "allegations of ambiguity become self-fulfilling." *State v. Porterfield*, 829 N.E.2d 690, 692-93 (Ohio 2005).

The parties agree that the Amended Contract is clear and unambiguous, but each interprets its language differently.[2] Both sides agree that Claims Targets were agreed to in the Original Contract, the 2010 Fee Proposal, and the 2011 Fee Proposal. Indeed, these Claims Targets were used to establish CCP's Performance Fee for the first three years of the agreement. Dulcich argues that once it switched to a fixed fee structure in 2012, however, there was no longer any need for the parties to agree on Claims Targets, and consequently, no such targets were agreed to in the 2012 Fee Proposal or the 2013 Fee Proposal.

Defendant, for its part, describes this argument as "incredible," "baseless," and a "red-herring" (Def.'s Opp. 8, 11), and insists that because the 2013 Fee Proposal contained a set of

---

[2] "It is of course well settled that the fact that parties may adopt conflicting interpretations of a contract between them while involved in litigation will not create ambiguity or a basis for unreasonable interpretation of the language and original intent of the parties where no such ambiguity should reasonably be found." *Ohio Water Dev. Auth. v. W. Reserve Water Dist.*, 776 N.E.2d 530, 535 (Ohio Ct. App. 2002) (citations omitted).

PAGE 7 – FINDINGS AND RECOMMENDATION

Claims Targets for the upcoming plan year and because Dulcich "signed and accepted a fee proposal that identified the claims targets for the final plan year," it must necessarily have agreed to those targets. (Def.'s Opp. 8) (emphasis in original).

The Court does not agree with CCP's logic. As Dulcich correctly points out, the 2013 Fee Proposal is not a standard contract in which the parties' signatures indicate their acceptance of the entire document. Instead, terms and conditions pertinent to four different (and mutually exclusive) Renewal Options are all contained in a single document. Dulcich was then asked to select one of four different options:

| Accepted: | | | | |
|---|---|---|---|---|
| Renewal Option Selected: | 1 ☐ | 2 ☐ | 3 ☐ | 4 ☑ |

Pacific Seafood
By: _[signature]_
Its: _Benefits Manager_
Date: _9/12/13_

(2013 Fee Proposal at 3.) By checking the box for Option 4, Dulcich necessarily selected some of the 2013 Fee Proposal's terms and rejected others. The Court must therefore closely scrutinize the document to determine what, *precisely*, the parties actually agreed to.

The 2013 Fee Proposal begins by detailing the four Renewal Options that CCP offered to Dulcich for the November 2013 – October 2014 Plan Year. *See supra* at 4. Renewal Option 1 sets forth a series of (identical) Claims Targets for three different categories of care:

| Renewal Option 1: 100% Performance-Based against 3 Distinct Targets | | | | |
|---|---|---|---|---|
| Category of Care: | Basic Medical | Complex Medical | Pharmacy | Total |
| CHC Claims Target for Fee Determination[2] | $3,788,042 | $1,705,537 | $877,069 | $6,370,649 |

(2013 Fee Proposal at 1.) Option 2 gives an identical set of Claims Targets:

PAGE 8 – FINDINGS AND RECOMMENDATION

| Renewal Option 2: Performance-Based against 3 Distinct Targets with Global Minimum/Maximum ||||||
|---|---|---|---|---|
| Category of Care: | Basic Medical | Complex Medical | Pharmacy | Total |
| CHC Claims Target for Fee Determination[2] | $3,788,042 | $1,705,537 | $877,069 | $6,370,649 |

(*Id.*) Finally, Option 3 specifies a single Claims Target, which is identical to the "Total Claims Target" in Option 1 and Option 2:

| Renewal Option 3: Global Target Option ||
|---|---|
| Category of Care: | Combined Basic Medical, Complex Medical, Pharmacy |
| CHC Claims Target for Fee Determination[2] | $6,370,649 |

(*Id.* at 2.)

CCP cannot rely on these charts to support its claim that Dulcich agreed to a set of Claims Targets during the final plan year, since the plain language of the 2013 Fee Proposal limits the application of these Claims Targets to Options 1, 2, and 3, respectively. Dulcich rejected these provisions when it selected Option 4, which does *not* contain any reference to Claims Targets at all:

| Renewal Option 4: Fixed Fee Option (Current Option) ||
|---|---|
| Fixed Monthly Fee: | The greater of $17,184 per month or $13.55 PMPM X actual members (minimum fixed fee of $206,206 annually) *Reflects a 2.9% increase* |
| Annual Adjustment: | The per member per month fixed fee shall be adjusted annually or at the renewal of each Plan Year by the greater of 0% or medical inflation based on the most recent 12 month inflation rates for medical services, all cities, as published by the Bureau of Labor Statistics |

(*Id.*)

The next section of the 2013 Fee Proposal that discusses Claims Targets is a box labeled "Target Adjustment at Renewal of Plan Year":

> **For Options 1 and 2 and Option 3 (Global):**
> Claims target for CHC fees in renewal years will be based on the CHC target for the immediate prior year adjusted as follows:
> Medical: Industry-reported medical inflation factor for commercial health plans + Demographic Factor Adjustment + Benefit Plan Modifications (if any) + Specific Deductible Changes (if any). No utilization trend factors will be considered.

PAGE 9 – FINDINGS AND RECOMMENDATION

> Pharmacy: Industry-reported pharmacy trend factors+
> Demographic Factor Adjustment + Benefit Plan Modifications (if any).
> Minimum, maximum, and advance will adjust based on the greater of 0% or the combined Medical/Rx inflation trend factors.
>
> **For Option 4 (Fixed Fee) conversion to performance-based fee structure:**
> If at renewal the client decides to convert from a Fixed Fee to a performance-based fee structure, CHC shall provide such a proposal. The claims targets, options and minimum/maximum rates presented in the proposal submitted for this 2013 Plan Year shall not be binding on a future proposal submitted at renewal where the client has previously elected for Option 4 (Fixed Fee).

(*Id.*) The first paragraph here is inapplicable, as it details how the Claims Targets listed for Options 1, 2, and 3 would have been modified for future years had Dulcich selected one of these options. The second paragraph addresses the procedure for "conver[sion] from [Option 4] to a performance-based fee structure," and states that under those circumstances, Dulcich would not be allowed to rely on the "claims targets, options and minimum/maximum rates" in the 2013 Fee Proposal. CCP would instead provide Dulcich with a new proposal upon request. None of these provisions suggest which Claims Targets (if any) would apply if Dulcich selects Option 4. To the contrary, this section further supports the conclusion that by selecting Option 4, Dulcich rejected the Claims Targets proposed for Options 1, 2, and 3, and could not rely on those targets in the future had it wished to return to a performance-based fee structure.

   Finally, the last page of the 2013 Fee Proposal contains a chart that lists the Claims Targets for Options 1, 2, and 3 (now labeled as "Total Budget Targets") and shows how they were calculated:

Following is how the CHC Claims Target was derived:

| Budget Calculation Detail | Basic Med | Complex Med | Pharmacy | Total |
|---|---|---|---|---|
| PMPM for 2011 PY | $215.80 | $94.63 | $49.92 | $360.34 |
| Trended for 2012 PY | | | | |
| Inflation | 6.50% | 6.50% | 6.40% | |
| Age/Sex Factor Change | 1.87% | 1.87% | 1.87% | |
| Spec Change to 145K | 0.00% | 2.90% | 0.00% | |
| Total Trend | 8.37% | 11.27% | 8.27% | 8.36% |
| Trended PMPM for 2012 PY | $233.86 | $105.30 | $54.05 | $393.21 |
| Trended for 2013 PY | | | | |
| Inflation | 5.50% | 5.50% | 5.70% | |
| Age/Sex Factor Change | 0.95% | 0.95% | 0.95% | |
| Total Trend | 6.45% | 6.45% | 6.65% | 6.48% |
| Trended PMPM for 2013 PY | $248.95 | $112.09 | $57.64 | $418.68 |
| Employees | 673 | 673 | 673 | 673 |
| Multiple | 1.88 | 1.88 | 1.88 | 1.88 |
| Enrollees | 1,268 | 1,268 | 1,268 | 1,268 |
| Months for 2013 PY | 12 | 12 | 12 | 12 |
| Projected 2013 Member Months | 15,216 | 15,216 | 15,216 | 15,216 |
| Total Budget Targets 2013 PY (based on current enrollment) | $3,788,042 | $1,705,537 | $877,069 | $6,370,649 |

(*Id.* at 3.) CCP cites this chart as proof that the parties agreed to a set of Claims Targets for the final plan year. (Def.'s Opp. 7-8; Def.'s Reply 4.)

The Court disagrees. The chart itself is labeled: "Following is how the CHC Claims Target was derived." The only references to "CHC Claims Targets" in the 2013 Fee Proposal other than in this chart are those listed for Options 1, 2, and 3. The clear, unambiguous meaning of this chart is therefore precisely what it says: to show how the Claims Targets for Options 1, 2, and 3 were derived. CCP argues that although Dulcich rejected the language in the 2013 Fee Proposal for Options 1, 2, and 3, Dulcich nevertheless accepted and should be bound to a chart that by its own terms does nothing more than explain how these rejected options were calculated. In essence, defendant asks this Court to interpret this chart as if CCP had instead labeled it, "Regardless of the Renewal Option selected, the parties agree to the following Claims Targets." However, the chart does not contain *any* language suggesting that these targets apply to Option

PAGE 11 – FINDINGS AND RECOMMENDATION

4, and as defendant correctly notes, this Court is "not permitted to add language to a contract that does not exist." (Def.'s Opp. 5) (citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997)).

CCP has identified no other provision in the 2013 Fee Proposal where Dulcich purportedly agreed to a set of Claims Targets for the final plan year, and having reviewed the Proposal in its entirely, the Court has located no other provisions that could support such a conclusion. The Court therefore concludes the parties did not agree to a Total Claim Target in the 2013 Fee Proposal. Section 6.6(a)(2) of the Original Contract specifies that the Termination Fee is owed only "if the Total Claims for the ending Plan Year are below the Total Claim Target for such ending Plan Year." Since the Total Claim Target does not exist, the condition specified in Section 6.6(a)(2) has not been met, and Dulcich does not owe the Termination Fee.

## CONCLUSION

The Court recommends that the district judge GRANT plaintiff's Motion for Summary Judgment (ECF No. 29), and DENY defendant's Motion for Summary Judgment (ECF No. 31). The Court further recommends that the district judge enter a declaratory judgment stating that Dulcich owes no Termination Fee to CCP, and dismissing defendant's counterclaim for breach of contract.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this  19th  day of January, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 13 – FINDINGS AND RECOMMENDATION